**VERIZON TELEPHONE COMPANIES,**
**Petitioner**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents**

**Covad Communications Group, Inc., et al., Intervenors.**

No. 08–1012.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 2008.

Decided June 19, 2009.

Scott H. Angstreich argued the cause for petitioners. With him on the briefs were Brendan J. Crimmins, Michael E. Glover, Edward H. Shakin, and Rashann Duvall.

Robert B. McKenna Jr., Russell P. Hanser, and Travis E. Litman were on the brief for intervenors Qwest Communications International Inc. and Qwest Corporation in support of petitioners.

Richard K. Welch, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Thomas O. Barnett, Assistant Attorney General, Catherine G. O'Sullivan and Nancy C. Garrison, Attorneys, U.S. Department of Justice, Matthew B. Berry, General Counsel, Federal Communications Commission, Joseph R. Palmore, Deputy

General Counsel, and Laurel R. Bergold, Counsel.

Brad E. Mutschelknaus, Genevieve Morelli, David P. Murray, Thomas Jones, Randy Branitsky, Russell M. Blau, Joshua M. Bobeck, Philip J. Macres, David E. Mills, J.G. Harrington, and Deanne O'Dell were on the brief of CLEC Intervenors and Amicus in support of respondents.

Joel H. Cheskis, Gerald A. Norlander, Louis Manuta, Stefanie A. Brand, Christopher J. White, Charles M. Browder, Jr., Senior Assistant Attorney General, Attorney General's Office of State of Virginia, Paula M. Carmody, Martha Coakley, Attorney General, Attorney General's Office of the Commonwealth of Massachusetts, Jesse S. Reyes, Assistant Attorney General, and Joseph Witmer were on the joint brief of intervenors in support of respondents. David C. Bergmann, Maureen R. Matsen, Assistant Attorney General, Attorney General's Office of State of Virginia, and Tanya J. McCloskey entered appearances.

Before: SENTELLE, Chief Judge, and GRIFFITH, Circuit Judge, and EDWARDS, Senior Circuit Judge.

Opinion for the Court filed by Chief Judge SENTELLE.

SENTELLE, Chief Judge:

Verizon petitions for review of a Federal Communications Commission (FCC) order denying Verizon's petitions for forbearance from its unbundling obligations under § 251 of the Communications Act, 47 U.S.C. § 251. Verizon contends that the FCC erroneously denied Verizon's petition for forbearance from local exchange unbundling regulations by unlawfully departing from the legal standards and analyses in its prior forbearance orders. Specifically, Verizon asserts that the FCC's order should be vacated because it relied on a newly minted bright-line market share test to determine whether the retail market in six Metropolitan Statistical Areas (MSAs) was sufficiently competitive to warrant forbearance from unbundling requirements. We agree that this test departs from FCC precedent by relying solely on actual, and not potential, marketplace competition. The FCC's unexplained departure from its precedent was in error. Accordingly, we grant Verizon's petition on this limited ground and remand for further consideration.

## I. BACKGROUND

### A.

Congress enacted the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (the Act), in the hopes of "uprooting the monopolies" that had, up until that point, controlled the local telephone markets, and fostering greater competition within each local service area. *Verizon Commnc'ns Inc. v. FCC*, 535 U.S. 467, 488, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002). To accomplish these goals, the Act gives the FCC broad power to require an incumbent local exchange carrier (ILEC) to provide its competitors (CLECs) with non-discriminatory access to elements of the ILEC's network on an unbundled basis. *See* 47 U.S.C. § 251(c)(3). In determining which unbundled network elements (UNEs) the ILEC must make available to CLECs in a particular market, the FCC must consider "at a minimum" whether the CLEC's ability to compete would be impaired without access to those UNEs. *See* 47 U.S.C. § 251(d)(2).[1]

---

**1.** The FCC must also consider whether "access to such network elements as are proprie-

tary in nature is necessary." 47 U.S.C.

The FCC has been through numerous attempts at defining what constitutes "impairment" under the Act. *See Covad Commc'ns Co. v. FCC,* 450 F.3d 528, 531, 533–34 (D.C.Cir.2006). In 1996, shortly after the Act passed into law, the FCC concluded that a CLEC was entitled to a particular UNE "if the quality of the service the entrant can offer, absent access to the requested element, declines and/or the cost of providing the service rises." *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* First Report and Order, 11 F.C.C.R. 15,499, 15,643 (1996). In *AT & T Corp. v. Iowa Utilities Board,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), the Supreme Court found this interpretation of "impairment" unreasonable. The Court construed the statute to apply a limiting standard in assessing which cost differentials would "impair" a CLEC's ability to compete. *Id.* at 388, 119 S.Ct. 721.

On remand, the FCC determined that a CLEC's ability to compete is "impaired" if, "taking into consideration the availability of alternative elements outside the incumbent's network, including self-provisioning by a requesting carrier or acquiring an alternative from a third-party supplier, lack of access to that element materially diminishes a requesting carrier's ability to provide the services it seeks to offer." *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* Third Report and Order and Fourth Further Notice of Proposed Rulemaking (*UNE Remand Order* ), 15 F.C.C.R. 3696, 3725 (1999). On review of the *UNE Remand Order,* we held that the Commission's broad concept of impairment was in error because it failed to properly balance the costs and benefits of unbundling. *U.S. Telecom Ass'n v. FCC*

*(USTA I),* 290 F.3d 415, 427–28 (D.C.Cir. 2002). In *USTA I,* we also instructed the FCC to make more nuanced impairment determinations. *Id.* at 426.

On remand from *USTA I,* the Commission found that a requesting carrier's ability to compete would

> be impaired when lack of access to an incumbent LEC network element poses a barrier or barriers to entry, including operational and economic barriers, that are likely to make entry into a market uneconomic. That is, we ask whether all potential revenues from entering a market exceed the costs of entry, taking into consideration any countervailing advantages that a new entrant may have. *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* Report and Order and Order on Remand and Further Notice of Proposed Rulemaking (*Triennial Review Order* ), 18 F.C.C.R. 16,978, 17,035 (2003). On remand, the FCC made an absolute national impairment finding, subject to specific findings of non-impairment by state public utility commissions. *Id.* at 17,058–59.

On review of the *Triennial Review Order,* we concluded that the FCC's "touchstone" of impairment—"uneconomic" entry—was excessively vague. *U.S. Telecom Ass'n v. FCC (USTA II),* 359 F.3d 554, 572 (D.C.Cir.2004). We also held that the FCC could not lawfully implement a more nuanced impairment standard by adopting a blanket finding of impairment and then delegating power to state regulatory commissions to make non-impairment exceptions to the FCC's nationwide rule. *Id.* at 565–68. Instead, we held that the FCC must establish unbundling criteria that take into account "relevant market characteristics" which capture "significant varia-

§ 251(d)(2)(A). This factor is not at issue in this case.

tion," *id.* at 563, sensibly define the relevant markets, *id.* at 563, 574–75, connect those markets to the FCC's impairment findings, *id.* at 574–75, and consider whether the "element in question" is "significantly deployed on a competitive basis," *id.* at 574 (quotation omitted).

After *USTA II,* the FCC modified its standards for determining impairment in the *Triennial Review Remand Order* and applied those revised standards to create a revised list of network elements that must be provided as UNEs. *See In the Matter of Unbundled Access to Network Elements (TRRO),* 20 F.C.C.R. 2533, 2615 (2005). As the FCC set forth in the *TRRO,* an ILEC must unbundle its network elements only "where [the FCC] find[s] that carriers genuinely are impaired without access to particular network elements and where unbundling does not frustrate sustainable, facilities-based competition." *Id.* at 2535. In the *TRRO,* the FCC declined to order unbundling of network elements on a nationwide basis in the mobile wireless and long distance services markets because those markets were sufficiently competitive. *Id.* at 2556–57. The FCC found that it was not appropriate to "render similar judgments" regarding the local telephone exchange and exchange access service markets. *Id.* at 2556. Nevertheless, the FCC did note that ILECs remain free to seek forbearance under § 10 of the Act from the application of unbundling rules in specific geographic markets where they believe the aims of § 251(c)(3) have been "fully implemented" and the other requirements for forbearance have been met. *Id.* at 2557. Under § 10(a) of the Act, the FCC may grant a forbearance petition only if it determines: (1) that enforcement of the requirement is not needed to ensure that rates are just, reasonable, and nondiscriminatory; (2) that the regulation is not necessary to protect consumers; and (3) that a grant of forbearance is consis-

tent with the public interest. 47 U.S.C. § 160(a).

Since the *TRRO,* the FCC has reviewed and issued orders on two such petitions for forbearance of unbundling rules. *See In the Matter of Petition of Qwest Corporation for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Omaha Metropolitan Statistical Area (Omaha Order),* 20 F.C.C.R. 19,415 (2005); *In the Matter of Petition of ACS of Anchorage, Inc. Pursuant to Section 10 of the Communications Act of 1934, As Amended, for Forbearance from Sections 251(c)(3) and 252(d)(1) in the Anchorage Study Area (Anchorage Order),* 22 F.C.C.R. 1958 (2007). In the *Omaha Order,* Qwest sought, as Verizon does here, forbearance from unbundling requirements and dominant carrier regulations. *Omaha Order,* 20 F.C.C.R. at 19,-421–22. The FCC granted Qwest's petition for forbearance in nine of the twenty-four wire centers in the Omaha MSA. In doing so, the FCC expressly stated that it would not apply the § 251(c)(3) impairment standard in determining whether to grant forbearance under § 10, as those standards were distinct. *See id.* at 19,424 n. 48. The FCC instead stated it would look solely to the criteria of § 10 in determining whether to grant forbearance. *Id.* at 19,423.

The FCC first assessed the level of retail competition and the role of the wholesale market. This factor, the FCC stated, was the "[m]ost important[ ]" factor in its forbearance analysis. *Id.* at 19,447. The FCC determined that, across the entire Omaha MSA, Cox Communications (the CLEC) had developed sufficient facilities-based competition and proved itself "capable of competing very successfully using its own network." *Id.* at 19,448. The FCC also found the Omaha wholesale market to be sufficiently competitive. *Id.* at 19,449–50. Having considered the level of compe-

tition in the Omaha MSA, the FCC then determined the extent of Cox's competitive facilities coverage. The FCC found forbearance was warranted in the nine wire centers where "Cox's voice-enabled cable plant covers at least [redacted] [2] percent of the end user locations that are accessible from that wire center." *Id.* at 19,446. Still, the FCC denied Qwest's petition for forbearance in the remaining fifteen Omaha wire centers where facilities-based competition was not as extensive as it was in the nine wire centers where forbearance was granted. *Id.* at 19,444.

In January 2007, ACS of Anchorage filed a similar petition to Qwest's petition in the Omaha MSA, seeking forbearance from its unbundling obligations in eleven wire centers in the Anchorage, Alaska MSA. As it had done in the *Omaha Order,* the FCC stated that its "sole task" was "to determine whether to forbear under the standard of section 10." *Anchorage Order,* 22 F.C.C.R. at 1965. The FCC further stated that this Order would not determine whether ACS's competitors had "prove[n] impairment without access to UNEs" under § 251. *Id.* at 1965 n. 36 (quotation omitted). Accordingly, the FCC stated in no uncertain terms that "we do not—and cannot—issue comprehensive proclamations in this proceeding regarding nonimpairment status in the Anchorage study area." *Id.* at 1965. The FCC then proceeded to analyze whether forbearance was warranted, and applied the same two-part test that it had applied in the *Omaha Order. See id.* at 1963–64. Applying the first step of the test, the FCC concluded that "[r]etail competition in the Anchorage study area is robust." *Id.* at 1975. The FCC then assessed whether ACS's chief competitor's facilities covered a sufficient portion of each wire center. The FCC determined consistently that forbearance

was warranted only in the five wire centers in which ACS's competitors had at least [redacted] percent coverage of the end user locations. *Id.* at 1976–77.

## B.

On September 6, 2006, Verizon filed the present petitions for forbearance from section 251(c)(3) loop and transport unbundling requirements in six Metropolitan Statistical Areas (MSAs): Boston, New York, Philadelphia, Pittsburgh, Providence, and Virginia Beach. In an order issued December 5, 2007, the FCC denied Verizon's petitions. *In the Matter of Petitions of the Verizon Telephone Companies for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Boston, New York, Philadelphia, Pittsburgh, Providence and Virginia Beach Metropolitan Statistical Areas,* Memorandum Opinion and Order (*Order* ), 22 F.C.C.R. 21,293 (2007). The FCC found that each element of § 10(a) was not satisfied because there was insufficient evidence of facilities-based competition. *Id.* at 21,314; *id.* at 21,318 ("There is insufficient evidence of competition . . . for us to determine that consumers will be protected if we forbear . . . ."); *id.* (concluding that "forbearing from UNE obligations is not in the public interest" under § 10(a)(3) because there was insufficient evidence of competition to determine that consumers would be protected under § 10(a)(2)). In reaching this decision, the FCC relied heavily on the fact that record evidence showed that Verizon still had greater than a [redacted] percent share of the retail market in each of the six MSAs. The FCC also found that the record evidence showed that most of Verizon's competitors relied in substantial part on Verizon's own facilities, including those unbundled network elements that Verizon did not want to

---

**2.** Proprietary figures have been redacted.

unbundle. An examination of the wholesale market did not alter the FCC's analysis. The FCC noted that the evidence showed that Verizon's competitors had deployed facilities that meet the [redacted] percent coverage threshold in certain wire centers in each of the six MSAs. Nevertheless, the FCC held that it had not granted forbearance simply on the basis of facilities coverage in the *Omaha Order* and *Anchorage Order*, and would not do so here. The FCC stated that the "[m]ost important[ ]" factor in its § 10 forbearance analysis was "evidence of 'successful' facilities-based competition." *Id.* at 21,313 n. 113.

## II. ANALYSIS

### A.

■ Verizon first argues that the test applied by the FCC was improper because it is based primarily on an analysis of market share. This, Verizon argues, contravenes § 251 of the Act because, under that section, ILECs must offer access to network elements at low UNE rates only when the FCC finds that "the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide . . . service[ ]." 47 U.S.C. § 251(d)(2)(B). Building on the phrase "impair the ability" in § 251, Verizon argues that unbundling is appropriate only if CLECs lack the "ability" to compete using their own facilities. Where a CLEC has the "ability" to compete—that is, where "competition is possible," *USTA II*, 359 F.3d at 575—the FCC cannot mandate unbundling under § 251. Therefore, Verizon reasons, when it has shown that the CLECs in the six MSAs are at least capable of competing, the FCC may not mandate unbundling.

Before turning to the merits, it is worth emphasizing what is not at issue in this appeal. We do not consider whether § 251 forecloses the FCC from mandating unbundling when "competition is possible." That issue is best addressed by a petition for a new rulemaking requesting that the FCC reassess its unbundling requirements under § 251. Verizon did not file such a petition in this case. Rather, Verizon merely sought forbearance under § 10 from these unbundling requirements in six MSAs across the country. The ruling under review in this case is the FCC's denial of Verizon's petitions for forbearance. *See Order*, 22 F.C.C.R. 21,293. The dispute before this court therefore concerns whether the statutory text of § 10—not § 251—contradicts the FCC's interpretation. We hold that it does not.

Verizon's argument fails because it unnecessarily conflates the FCC's impairment standard with the forbearance standard under § 10. As we have noted previously, the plain language of § 10 "imposes no particular mode of market analysis or level of geographic rigor." *EarthLink*, 462 F.3d at 8 (citing 47 U.S.C. § 160(a)). Section 10 does not ask the FCC to reconsider its decision in the *TRRO* that unbundling is still required in the local services market because CLECs' abilities to compete are impaired. Rather, as applied to the dispute in this case, the language of the section contemplates that the FCC will evaluate whether (1) enforcement of § 251's unbundling requirements in the local services market is not needed to ensure that rates are just, reasonable and non-discriminatory; (2) enforcement is not necessary to protect consumers; and (3) a grant of forbearance is consistent with the public interest. 47 U.S.C. § 160(a). In both the *Omaha Order* and *Anchorage Order*, the FCC consistently noted that its analyses under § 10 and § 251 were wholly distinct, and that the FCC was only assessing whether forbearance was warranted under § 10.

See, e.g., *Anchorage Order*, 22 F.C.C.R. at 1965 & n. 36 (rejecting ILEC's argument that the FCC should determine impairment under § 251 instead of whether forbearance was warranted under § 10); *id.* at 1961 n. 13 (noting that the standards used in § 251 impairment analysis are distinct from § 10 forbearance analysis and that § 251 "does not bind the Commission's forbearance review."); *Omaha Order*, 20 F.C.C.R. at 19,424 n. 48 (rejecting "commenters' proposals that [the FCC] interpret and apply the section 251(c)(3) impairment standard" in its § 10 forbearance analysis); *id.* at 19,424 n. 47 (noting that "neither section 10 nor the Commission's precedent directs [the FCC] to re-examine whether a rule carries out the goals of a prior rulemaking"). Similarly, in the *Order*, the FCC conducted a complete forbearance analysis under § 10 without reassessing its impairment determination under § 251. *See Order*, 22 F.C.C.R. at 21,312–18. We therefore are persuaded that the FCC's decision to refuse to interpret and apply its § 251 impairment standard in its analysis of Verizon's petition for forbearance under § 10 was reasonable.

## B.

▆▆▆ We must also ensure that the FCC's interpretation is not arbitrary and capricious under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). To survive review under this standard, the FCC must examine and consider the relevant data and factors, "and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quotation omitted); *see also EarthLink*, 462 F.3d at 9. If the FCC changes course, it "must supply a reasoned analysis" establishing that prior policies and standards are being deliberately changed. *Motor Vehicle Mfrs. Ass'n, Inc.*, 463 U.S. at 57, 103 S.Ct. 2856 (quotation omitted); *see also Wisc. Valley Improvement v. FERC*, 236 F.3d 738, 748 (D.C.Cir.2001) ("[A]n agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so.").

On review of Verizon's petitions for forbearance, the FCC determined that it was not required to grant forbearance because Verizon had not shown that the six MSAs were sufficiently competitive to warrant such relief. In reaching this decision, the FCC stated that it was most concerned with determining whether Verizon had shown that CLECs had been "successful" in their competitive efforts. *See Order*, 22 F.C.C.R. at 21,313 n. 113. The FCC did not appear concerned with whether CLECs had shown the capability for potential competition. *See id.* at 21,314 n. 116. Instead, the FCC applied a market share-based approach that it used to determine whether to grant Verizon's request for forbearance from dominant carrier regulations. *Id.* at 21,313. As it did in its dominant carrier regulation analysis, the FCC zeroed in on Verizon's market share as the dispositive factor in its unbundling regulation analysis. *Id.; see also id.* at 21,313 n. 113 (noting that the "[m]ost important[ ]" factor in its competitiveness analysis was "'successful' facilities-based competition") (quotation omitted); *cf. id.* at 21,307 (denying Verizon's request for forbearance from dominant carrier regulations because, "[i]n particular, Verizon's market shares in the MSAs at issue ... *are sufficiently high to suggest that competition in these MSAs is not adequate*" (emphasis added)). The FCC found that Verizon's market-share data in each of the six MSAs, "in themselves, [did not] support the grant of for-

bearance from UNE obligations." *Id.* at 21,313. The FCC noted further that, just as Verizon's market shares in the six MSAs were too high to warrant forbearance from dominant carrier regulations, so too were Verizon's market shares too high to warrant forbearance from its UNE regulation obligations. *Id.* As a result, the FCC found that there was insufficient facilities-based competition because Verizon still possessed over [redacted] of the market share in the six MSAs.

Verizon argues that the FCC's *Order* was arbitrary and capricious because the FCC relied exclusively on a market share test that is inconsistent with FCC precedent and the FCC failed to provide a reasoned explanation for this departure from its precedent. We agree. The *Order* rests solely on the view that, because Verizon possessed over a [redacted] percent share of the marketplace in each of the six MSAs, the petition for forbearance failed to make a showing that sufficient competition existed to satisfy the requirements of § 10. Though the FCC argues that it did not rely exclusively on Verizon's market share, and instead considered market share plus additional factors, this argument is not supported by the record. For instance, the FCC expressly stated that, just as Verizon's market shares in each of the six MSAs were not sufficient to warrant forbearance from dominant carrier regulation, the FCC was "likewise ... not persuaded that these data, in themselves, support the grant of forbearance from UNE obligations." *Id.* The FCC found further that the evidence offered by Verizon and others was not enough to alter the FCC's decision to rely on Verizon's market share as the determining factor in the FCC's UNE forbearance analysis. *See id.* at 21,313 n. 113 ("Neither Verizon nor other parties offer persuasive evidence regarding alternative the [sic] market share levels or other evidence of market compe-

tition by facilities-based providers that should be the focus of our analysis of forbearance from UNE obligations."). The FCC's apparent concern with only evidence of actual "successful" competition, *i.e.,* existing market share percentages, rather than the existence of potential competition indicates that it considered market share to be the dispositive factor in its UNE forbearance analysis. *Id.* at 21,313 & n. 113; *see also id.* at 21,314 n. 116.

Though the FCC claims that it considered insufficient facilities-based competition for enterprise and wholesale customers in addition to Verizon's market share, a comparison of this *Order* with the *Omaha Order* and *Anchorage Order* shows that these factors played no meaningful role in the FCC's determination. In the *Omaha Order,* the FCC relied on evidence that the CLEC had already had success attracting [redacted] of business customers and had "emerging success in the enterprise market" to support its conclusion that certain areas within the MSA were sufficiently competitive for UNE forbearance. *Omaha Order,* 20 F.C.C.R. at 19,448. The FCC also noted that the CLEC "possess[ed] ... the necessary facilities to provide enterprise services," and had "sunk investments in network infrastructure." *Id.* And yet, in the *Order* under review, the FCC found similar evidence submitted by Verizon *insufficient* to support a finding of competitiveness in the six MSAs. *See Order,* 22 F.C.C.R. at 21,315, 21,314 n. 116. A comparison of the FCC's analysis of the wholesale markets in the *Omaha Order* and *Anchorage Order* and this *Order* reveals similar results. In both the *Omaha Order* and *Anchorage Order,* the FCC found that the record did not "reflect any significant alternative sources of wholesale inputs for carriers" in either the Omaha or Anchorage MSAs. *Omaha Order,* 20 F.C.C.R. at 19,448; *Anchorage Order,* 22

F.C.C.R. at 1977. The lack of any significant alternative wholesale input sources in those two *Orders* did not prevent the FCC from concluding that forbearance was warranted. Nevertheless, in this *Order* the FCC relied on the very same finding—using the same language, in fact—to support its finding that the six MSAs were *not* competitive. *See Order,* 22 F.C.C.R. at 21,315 (noting that the record in this case did "not reflect any significant alternative sources of wholesale inputs for carriers in the 6 MSAs"). The FCC cannot convincingly argue that these factors now prevent Verizon's petition for UNE forbearance when the same factors did not prevent forbearance in the *Omaha Order* and *Anchorage Order.* The fact that these factors were applied similarly but yielded opposite results renders them meaningless in the analysis. Removing these factors from the analysis, the only distinguishing factor between the *Omaha Order* and *Anchorage Order,* in which the FCC granted forbearance, and this *Order,* in which the FCC denied forbearance, is that the ILECs in the *Omaha Order* and *Anchorage Order* no longer possessed [redacted] percent of the marketplace, whereas in this case Verizon has not yet lost that same percentage in the six MSAs at issue. Verizon's market share in each of the MSAs therefore appears to have been the dispositive and essential factor in the FCC's conclusion to deny Verizon's UNE forbearance petitions, and not merely one of several factors in its determination. *See AT & T Corp. v. FCC,* 236 F.3d 729, 736 (D.C.Cir.2001).

As Verizon points out, the FCC's reliance on an ILEC's actual market share as the essential factor in its UNE forbearance analysis is contrary to its precedent in the *Omaha Order* and *Anchorage Order.* First, in the *Omaha Order* and *Anchorage Order,* the FCC did not apply such a market share-based analysis when determining whether to grant UNE forbearance. In the *Anchorage Order,* the FCC expressly rejected ACS's request to apply a traditional market power review to its UNE forbearance analysis, stating that the FCC "did not define product markets for the purpose of its UNE forbearance analysis in the *Qwest Omaha Order,* and nothing in the language of section 10 leads us *to depart from this precedent* and undertake this aspect of dominant carrier analysis here." 22 F.C.C.R. at 1966 (emphasis added). Rather, the FCC noted that under a UNE forbearance analysis, it considered various markets "in a broader evaluation of competition ... rather than as steps in a traditional market power review." *Id.* at 1966 n. 41. We echoed this reasoning in *EarthLink,* noting that it was reasonable for the FCC to have decided against applying a traditional market power analysis to assess competition in emerging and developing technology markets, such as the local services market. *See EarthLink,* 462 F.3d at 9.

Second, the FCC has consistently considered *both* actual and potential competition in assessing whether a marketplace is sufficiently competitive to warrant UNE forbearance. In the *Omaha Order,* the FCC noted a number of times that its determination that the Omaha marketplace was sufficiently competitive was based on an assessment of existing *and potential* competition. *See, e.g., Omaha Order,* 20 F.C.C.R. at 19,446 ("Our decision today also is based on other actual and potential competition, which we find either is present, or readily could be present, in 100 percent of Qwest's service area in the Omaha MSA."); *id.* at 19,447 ("We also rely on the continued operation of other provisions of the Act *designed to develop* and preserve competitive local markets ... [and] are convinced that this facilities-based competition, combined with *the other competition made possible by*

*our rules,* suffices to satisfy the section 10(a) criteria ...." (emphasis added)); *id.* at 19,450 ("We believe that in conjunction with the extensive facilities-based competition from Cox (both existing *and potential*), this competition that relies on Qwest's wholesale inputs ... supports our conclusion that section 251(c)(3) unbundling obligations are no longer necessary ...." (emphasis added)); *id.* at 19,451 (considering as part of its competitive facilities coverage analysis that certain areas "are precisely the geographic areas where we expect to see *further investment and deployment by Cox,* and where we are most likely to see other competitors make the investments necessary to provide service" (emphasis added)). And as we have noted in *Covad,* even in the *TRRO,* the FCC's order from which these forbearance petitions were born, the FCC "repeatedly justifie[d] its unbundling determinations on the basis of both actual *and potential* competition." *Covad Commc'ns,* 450 F.3d at 540 (citing a multitude of *TRRO* references to the FCC's consideration of actual and potential competition). The FCC's decision to apply a market power analysis relying virtually exclusively on actual market share departs from this precedent.

It is true, as the FCC points out, that Congress did not prescribe a "particular mode of market analysis" or otherwise dictate how the FCC must make predictive judgments "within [its] field of discretion and expertise," such as those required under § 10 of the Act. *EarthLink,* 462 F.3d at 8, 12 (quotation omitted). Indeed, it may be reasonable in certain instances for the FCC to consider an ILEC's possession of [redacted] percent, or any other particular percentage, of the marketplace as a key factor in the agency's determination that a marketplace is not sufficiently competitive to ensure its competitors' abilities to compete. It may also be reasonable for the FCC to consid-

er only evidence of actual competition rather than actual and potential competition. Nevertheless, it is arbitrary and capricious for the FCC to apply such new approaches without providing a satisfactory explanation when it has not followed such approaches in the past. *See AT & T Corp.,* 236 F.3d at 736; *see also Wisc. Valley Improvement,* 236 F.3d at 748; *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970). In this case, the FCC changed tack from its precedent and applied a per se market share test that considered only actual, and not potential, competition in the marketplace. The flaw is not in this change, but rather in the FCC's failure to explain it. *See AT & T Corp.,* 236 F.3d at 736; *Wisc. Valley Improvement,* 236 F.3d at 748. In the *Order,* the FCC without explanation applied these newly dispositive factors as if that had always been its method of competitiveness analysis. *See Order,* 22 F.C.C.R. at 21,313 (relying on market share analysis of dominant carrier regulations to justify denial of forbearance from UNE obligations); *id.* at 21,313 n. 113 (noting that the "[m]ost important[ ]" factor in its competitiveness analysis was " 'successful' facilities-based competition") (quotation omitted); *cf. id.* at 21,314 n. 116 (stating that "the present record does not justify forbearance" even though CLECs were potential and "emerging sources of competition" and had made "some competitive gains against Verizon"). These "conclusory statements" that such factors are being considered "cannot substitute for the reasoned explanation that is wanting in this decision." *AT & T Corp.,* 236 F.3d at 737 (quoting *ARCO Oil & Gas Co. v. FERC,* 932 F.2d 1501, 1504 (D.C.Cir. 1991)).

■ In cases such as this one, in which an agency "has failed ... to explain the path that it has taken, we have no choice

**305**

but to remand for a reasoned explanation." *AT & T Corp.*, 236 F.3d at 737 (quoting *Tex Tin Corp. v. EPA,* 935 F.2d 1321, 1324 (D.C.Cir.1991)). Accordingly, we must remand the FCC's *Order* so that the Commission can "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856. On remand, the FCC must either consider whether competition might be established by some evidence other than simply whether the ILEC has met a particular market share benchmark, or justify its departure from its precedent. The FCC must also consider whether and how the existence of potential competition would affect its § 10 forbearance analysis.

### C.

Verizon argues that under § 10(c) we should vacate the *Order,* remand for the FCC to reconsider its decision, and require the FCC to issue a new decision within 30 days from the issuance of the mandate. In effect, Verizon hopes to spur the FCC to swift action, with the added bonus that if the FCC does not act within that 30–day time period, Verizon's petitions for UNE forbearance should be deemed granted. We disagree.

As noted above, the appropriate remedy in a case such as this is to remand for a reasoned explanation. *See AT & T Corp.,* 236 F.3d at 737. Moreover, Verizon's contention that § 10(c) supports the imposition of such a restrictive time frame on remand has no support in the provision's text. Section 10(c) states that "[a]ny telecommunications carrier … may submit a petition to the Commission" requesting forbearance, and that "such petition shall be deemed granted if the Commission does not deny the petition … within one year *after the Commission receives it ….*" 47 U.S.C. § 160(c) (emphasis added). There

is no statutory requirement that § 10(c)'s mandate of deeming a petition granted applies to the FCC's receipt of a petition on remand from this Court. Nor does Verizon identify any case in this or any other Circuit in which a court has imposed such a remedy on the FCC. In fact, as the FCC notes, the only case that Verizon relies on for this proposition ultimately decided *not* to impose such a quick time line or deem the petition automatically granted for failure to resolve it fully within this period. *See Verizon Tel. Cos. v. FCC,* 374 F.3d 1229, 1235 (D.C.Cir.2004). Accordingly, we deny Verizon's requested remedy, and remand the *Order* in the manner previously described.

*So ordered.*