# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 14, 2020          Decided November 3, 2020

No. 19-1164

COMPTEL, D/B/A INCOMPAS,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

USTELECOM, THE BROADBAND ASSOCIATION,
INTERVENOR

Consolidated with 19-1202

On Petitions for Review of an Order of the
Federal Communications Commission

*David P. Murray* argued the cause for petitioner COMPTEL.  With him on the briefs were *Thomas Jones*, *Mia Guizzetti Hayes*, and *Samuel H. Eckland*.  *Angela M. Kronenberg* entered an appearance.

*Enrique Gallardo* argued the cause for petitioner California Public Utilities Commission.  With him on the briefs

were *Arocles Aguilar* and *Helen M. Mickiewicz.* *Kimberly Lippi* entered an appearance.

*Thaila Sundaresan,* Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were *Michael F. Murray*, Deputy Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *Thomas M. Johnson Jr.*, General Counsel, Federal Communications Commission, and *Richard K. Welch*, Deputy Associate General Counsel. *Ashley S. Boizelle*, Deputy General Counsel, *Jacob M. Lewis*, Associate General Counsel, and *James M. Carr*, Counsel, entered appearances.

*Katherine C. Cooper* argued the cause for intervenor USTelecom in support of respondents. With her on the brief was *Scott H. Angstreich*.

Before: SRINIVASAN, *Chief Judge*, TATEL, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: Local Exchange Telephone Carriers (hereinafter "incumbents") at one time had monopoly positions. In 1996, Congress, in order to foster competition, obliged incumbents to sell to Competitive Local Exchange Carriers (hereinafter "insurgents") their voice services for resale to customers.[1] The maximum rate the

---

[1] The Agency and thereby the parties regularly use the acronym "ILEC" for Incumbent Local Exchange Carriers, and "CLEC" for Competitive Local Exchange Carriers, but we prefer the use of the English language and deplore the practice of using acronyms unknown to the general public. Thus, we use "incumbents" to refer to what the parties call "ILECs," and "insurgents" to refer to what the parties call "CLECs."

incumbents could charge was their wholesale price. Congress also obliged the incumbents to lease the use of network elements (called "unbundling") at cost—in case the insurgents didn't want the whole service. But the FCC determined that incumbents no longer dominated the telecommunications market because of the plethora of competitor modes of voice transmission. Accordingly, the FCC exercised its statutory authority to forbear from enforcing the wholesale pricing requirement and one element of the unbundling requirement. The insurgents contest the propriety of the FCC's forbearance of the wholesale price requirements. California's Public Utility Commission (CPUC) brings a separate challenge to the forbearance of the unbundling requirement. We reject both petitions.

## I.

This case involves two statutory provisions related to legacy wired telephone services (Plain Old Telephone Service).[2] As noted, the first requirement is for incumbents to "unbundle" network elements. It requires incumbents to lease the use of specified elements of their networks—at cost-based rates—to entrants into local telephone markets, which we refer to as insurgents. These competitors could then use the leased network elements in combination with their own facilities to provide retail services. Of particular importance in this litigation is a certain type of network element known as Analog Loops, which are copper wires that provide connections between the incumbent's switches and the customer premises.

Perhaps more significant is the other provision, avoided-cost resale. This provision requires incumbents to offer insurgents, at wholesale rates, any telecommunications service that they offer to customers. The wholesale rate is the retail rate for the service minus "avoided costs," which include such costs as marketing, billing, and collection. These rates are

---

[2] *See* 47 U.S.C. § 251(c)(3)–(c)(4).

almost exclusively, if not entirely, used by insurgents to provide legacy Time-Division Multiplexing (TDM) voice service to business customers. TDM is a method of transmitting and receiving multiple independent signals over a common transmission line, and it is the primary technique used for traditional voice communications over copper wires.[3]

The Telecommunications Act vests the Commission with the unusual authority and responsibility to forbear from enforcing provisions of the Act and related regulations when they are no longer necessary for competition, consumer welfare, or the public interest. *Verizon v. FCC*, 770 F.3d 961, 964 (D.C. Cir. 2014). The Commission must forbear from applying a statutory provision or regulation if the Commission determines:

> (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

> (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

> (3) forbearance from applying such provision or regulation is consistent with the public interest.

---

[3] TDM is also used for some voice communications over other wires, including for some voice communications over fiber.

47 U.S.C. § 160(a).  The public interest element is clarified by 47 U.S.C. § 160(b) which explains that:

> In making the [public interest determination], the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services.

The Commission's forbearance authority is further informed by § 1302(a) which states:

> The Commission . . . shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing, in a manner consistent with the public interest, convenience, and necessity . . . regulatory forbearance . . . or other regulating methods that remove barriers to infrastructure investment.

USTelecom, a national trade association representing incumbents, asked the Commission to forbear from enforcing the unbundling requirement with respect to Analog Loops and the avoided-cost resale requirement in relation to TDM over copper wires.  USTelecom's forbearance request was limited to legacy telecommunications networks.  The FCC had already forborne from many unbundling requirements for next-generation telecommunications networks, such as those that use fiber.  *See, e.g.*, *2015 USTelecom Forbearance Order*, 31 FCC Rcd 6157; *Triennial Review Order*, 18 FCC Rcd 16978, 16984 ¶ 3 (2003).  Similarly, avoided-cost resale requirements generally do not apply to next-generation voice services, such as Voice Over Internet Protocol (VoIP)-based services.  As

opposed to TDM, VoIP refers to a method of transmitting and receiving voice signals through an internet-based connection, such as receiving voice services through one's internet provider directly or through "over-the-top" applications that use the internet, such as Google Voice, Skype, or Zoom.

USTelecom's main argument in support of its forbearance petition was that the market for voice services had become highly competitive. It claimed that next-generation voice service providers had supplanted the incumbents' offerings and were the new market leaders. Thus, the statutory requirements were no longer necessary to discipline prices and were allegedly harmful because—by allowing insurgents to operate on incumbents' legacy networks at reduced rates—the regulations effectively subsidized insurgents' TDM copper offerings and thus slowed the transition to next-generation networks.

Several commenters opposed the forbearance petition before the agency. They argued that the competition for voice services was neither as significant nor as geographically widespread as US Telecom had alleged. Some asserted that business and government customers continue to demand TDM copper offerings because of its greater reliability due to its distinctive line-powered feature—unlike other types of voice services, phones using TDM copper can operate without an external power source or battery. In this regard, several state regulators raised concerns about how forbearance would affect the 9-1-1 system and questioned whether forbearance would decrease the availability of TDM copper and thus threaten public safety in emergency situations. Other opponents asserted that, because forbearance would restore incumbents to a monopoly position at least in TDM copper, forbearance would actually discourage incumbents—if not insurgents—from investing in next-generation networks.

The Commission granted the requested forbearance from enforcement of both the unbundling requirement for Analog

Loops and wholesale pricing requirement for TDM over copper.[4]

In its Order—actually a Rule—the FCC found that incumbents face significant and increasing intermodal competition for voice services. While they once controlled virtually all of the market for voice services, the promulgation of new modes of voice communication—including mobile phones, voice services through cable and fiber providers, and other VoIP voice services—have created a competitive market. Mobile phones are now nearly ubiquitous, though they can be subject to gaps in wireless coverage and rely on batteries to remain operable. Cable and fiber providers offer voice services to homes and businesses through their wired connections instead of through the traditional copper telephone network. But unlike TDM copper, cable and fiber voice services generally cannot be used when the power goes out unless there is a battery back-up. Other "over-the-top" VoIP services, like Google Phone, Skype, or Zoom, make use of an existing internet connection to provide voice services, and their reliability depends on the reliability of the underlying internet connection.

Rather than the near-complete monopoly that incumbents had as recently as 1996, now incumbents account for just 12% of all voice connections (both wired and mobile voice plans) and 37% of all wireline telephone connections (the subset of all voice connections that are physical rather than wireless—*e.g.*, TDM copper, cable, and fiber). Lines sold through the unbundled copper loops account for less than 0.5% of all voice connections (less than 2% of wireline connections) and resold lines account for just over 1% of all voice connections (3% of

---

[4] The Order only applies to "price cap" incumbents. Price cap incumbents are those subject to the Commission's price regulations, including (prior to forbearance) both provisions at issue in this case. There are some "non-price-cap" incumbents that serve mostly rural markets and are unaffected by the Order.

wireline connections). Further, the Commission found that next-generation voice services like mobile phones and Voice Over Internet Protocol (VoIP) services are rapidly growing, whereas traditional copper wire voice services are declining in both market share and in absolute terms.

The FCC concluded that, given this intermodal competition, the unbundling and wholesale pricing requirements are not necessary to maintain just and reasonable prices or protect consumers (thus addressing the first two forbearance requirements). The Commission predicted that, in order to maintain the volume of subscriptions on their copper networks, incumbents will continue to offer unbundling and resale at market rates. Separate statutory provisions prohibit discriminatory charges and require the resale of voice services, albeit not at regulated prices.[5] And intermodal competition will discipline prices for consumers and will prevent unreasonable rates. Accordingly, the Commission found that, if prices were to rise for insurgents leasing network elements or reselling voice services, there is no indication that those new rates would be unreasonable. Even assuming prices for some consumers would rise a limited extent, consumers would benefit over the long-term because forbearance would encourage the transition to next-generation voice services from which all consumers will benefit.

Finally, the Commission concluded that forbearance from the unbundling and the wholesale pricing requirements would each benefit the public interest (the third requirement) because, as noted, they will encourage the transition to next-generation voice services. The FCC reasoned that insurgents would be induced to invest in their own new facilities. More controversial, however, the Commission also concluded that incumbents would also be induced to similarly invest because the statutory provisions at issue "trap" the incumbents into

---

[5] *See, e.g.*, 47 U.S.C. §§ 201, 202, 214, 251(b)(1).

maintaining outdated equipment. Still, the key to the FCC's determination is that the statutory provisions impose unnecessary costs on the incumbents and discourage insurgents and other potential competitors from investing in their own facilities-based networks and next-generation services.

COMPTEL d/b/a/ INCOMPAS (hereinafter "Incompas") petitioned to challenge solely the forbearance of the avoided-cost resale provision. (Incompas is an industry association that includes insurgents as some of its members.) Whereas the California Public Utilities Commission (CPUC), California's telecommunications regulator, also filed a petition before us that challenges forbearance of the unbundling provision. These two cases raising similar but separate challenges were consolidated. USTelecom intervened in support of the FCC.

## II.

Although Incompas challenges only the FCC's forbearance of the so-called avoided-cost resale (wholesale) provision, and CPUC contests the FCC's forbearance of the unbundling requirement, the Commission's analysis of both provisions focuses on the same market conditions. And both Petitioners' arguments before us overlap, except that CPUC presents a safety argument regarding the 9-1-1 system which we are obliged to deal with separately. Petitioners contend that somehow it was inappropriate to analyze both requirements in similar fashion, but we think there is absolutely no merit to this contention because the concerns that justify the Commission's forbearance of the two provisions are essentially the same.

Petitioners, particularly Incompas, also present a blizzard of administrative law arguments against the rule.[6] A number of these assert that the FCC's Order is inconsistent with its past decisions or that the government now raises post hoc

---

[6] We wonder what happened to the term "brief."

arguments. We deal with most of these issues in the final section of this opinion.

***

The nub of both Petitioners' complaints is rather simply explained. Incumbents, although transitioning to new modes of voice communication (like fiber, cable, etc.), still maintain existing copper loops for which there is still some demand. That is particularly true for governments and certain businesses that want line-powered redundancy in addition to the more advanced modalities. The insurgents, who themselves are gradually introducing new techniques for voice transmission, want to continue to be able to purchase incumbents' services utilizing copper loops at a subsidized rate. Their business model is, at present, largely based on providing the aforementioned business and government customers with phone service over copper loops. (Some insurgents occupy a rather interesting market niche; they bundle together the services of various incumbents which are geographically limited, and sell that bundled product to government and business customers.)

Petitioners would have the voice services provided to business and government customers analyzed as a separate market. And although insurgents recognize the demand for voice services over copper is declining, they contend that incumbents still have market power for that specific service because it would be too expensive for insurgents to build their own copper loops—particularly in light of the declining demand for copper wires. Therefore it is unreasonable (*i.e.*, arbitrary and capricious) for the FCC to decline to enforce the wholesale requirement. But the Commission explained that "the record does not support a finding that such a narrow market segment constitutes its own market" because consumers and businesses of all stripes are turning to next-generation services. *See Order* at 18, n.116. Even if forbearance would disadvantage the market position that insurgents have obtained

by virtue of the regulation, the FCC's mandate is to protect competition, not competitors. *Order* at 26 & n.170.

The Commission looked, reasonably in our opinion, at the whole national market for voice transmission, and the incumbents' share of that market is declining rapidly. Indeed, from the point of view of the incumbents, alarmingly. Far from the market behemoths the incumbents were in the late 90s, they look more like the sick men of the voice transmission market. Their copper wire advantage is of rapidly declining importance. It is myopic to look at the incumbents' possession of copper loops as giving them meaningful market power in the national voice market. And therefore what earthly economic reason would justify requiring them to provide their copper wire services to competitors at a subsidized price?

To be sure, there are isolated geographic locations where the competing modes are less robust. And so, the Petitioners would have the FCC focus on these locations, insisting that the Commission is obliged to look at market power in every locality. We think, however, the FCC was quite reasonable to focus on the national market when making national policy. *See Earthlink, Inc. v. FCC*, 462 F.3d 1, 9 (D.C. Cir. 2006) (holding that the forbearance provision imposes "no particular mode of market analysis or level of geographic rigor" and that the FCC is free to "tailor the forbearance inquiry to the situation at hand"); *2015 USTelecom Forbearance Order*, 31 FCC Rcd 6157, 6164 (rejecting a market by market analysis when analyzing a request for nationwide forbearance of various regulations of incumbent carriers).

Even if the Commission is not required to look at every geographic area, Petitioners contend that the FCC should have taken a closer look at the Order's effect on rural areas. Petitioners note that broadband is not widely available in rural areas, and thus VoIP voice services—which rely on broadband—are unable to discipline prices. The FCC replied that the Order only applies to "price cap" incumbents (*see* note

4, *supra*) and because rural areas are largely served by non-price cap incumbents, they are largely unaffected. Incompas then cries foul, calling this a post hoc rationale, and thus in violation of *Chenery*. *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). We disagree. It is fully consistent with *Chenery* for the Commission to point to the express limitation of the scope of its order. While the Commission's Order did not explicitly address the availability of broadband in rural areas, it clearly stated that it only granted forbearance as to "price cap" incumbents. *Order* ¶ 9. And the Order explains that the FCC considered variations in the availability of the modes of voice services. *Order* ¶ 49 (noting both the common as well as the "almost universal" modes of voice communications). The evidence before the Commission was that 99.4% of the US population lives in a census block in which at least two mobile phone providers have LTE coverage.[7] *See* Order ¶ 48, n.160 (*citing 2018 Communications Marketplace Report*, 33 FCC Rcd 12558, 12592, Fig. A–29 (2018)).

In a rulemaking, an agency is not required to respond to insignificant comments. *See Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984) (The APA "has never been interpreted to require the agency to respond to every comment, or to analyse every issue or alternative raised by the comments, no matter how insubstantial."). Given the Order's limitation to price-cap incumbents, the concerns expressed by Petitioners concerning rural areas were insignificant. That those concerns were more explicitly responded to in the Agency's brief is perfectly appropriate. In sum, we think the Commission gave adequate consideration to service in rural areas.

As we noted, the Commission justified its forbearance policy by stating that it would induce incumbents and insurgents to develop more advanced networks. Although the

---

[7] LTE, or Long-Term Evolution, is a mobile voice and broadband standard. Mobile devices which can access LTE networks are generally able to both make and receive calls and access the internet.

incumbents would still be obliged to provide service to insurgents, that service would no longer be offered at a regulated price. One can understand why insurgents would be induced to invest in advanced facilities if the incumbents raise prices. It is, after all, basic economics that higher prices tend to encourage shifting to substitutes, particularly more modern substitutes.

The Commission insisted, however, § 251(b)(1) would still apply. It will be recalled, this provision requires incumbents to offer voice services for resale and prevents unreasonable and discriminatory pricing. But, as Petitioners point out, relief under that section—even if it is available—comes ex post after long delay, whereas the wholesale pricing requirement—enforced ex ante by the state—is much more effective.

So we agree with Petitioners that forbearance from the wholesale requirement will likely increase insurgents' prices for TDM over copper loops, but, combined with the declining importance of those loops, it is only logical the insurgents will be induced to invest in more advanced facilities and that will benefit consumers. *See* 47 U.S.C. § 1302(a) (requiring the Commission to use its forbearance authority to encourage the deployment of advanced services).

A good deal more dubious, however, is the Commission's claim that forbearance would induce the *incumbents* to update their facilities. The Agency said the existing requirements "trapped" the incumbents into maintaining copper loops. We do not understand what the Agency meant. Petitioner's counsel at oral argument shrewdly focused his primary objection to that Commission observation. Counsel noted that "for the last 20 years, the Commission has recognized that avoided-cost resale does not . . . have any influence on [incumbents'] decisions to deploy next-generation networks." We think Petitioner's counsel was absolutely correct to object to this puzzling FCC statement because nothing stops the incumbents from abandoning copper loops. Indeed, the Commission's

regulations explicitly authorize the incumbents to do just that.[8] This bit of confusing language might have suggested a remand, if it were not for footnote 52 of the Order, which explains that "Incumbent[s] can relieve themselves of unbundling requirements by retiring copper." In other words, the footnote clarifies the statement in the body concerning the incumbents being "trapped." Under these circumstances, we can regard the "trapped" observation in the body of the Commission's opinion—which is not essential to the Commission's rule—as careless wording.

\*\*\*

Turning to the separate challenge mounted by CPUC—regarding forbearance from the unbundling requirement—as we have already noted, the Commission's reasoning largely coincides with its justification for forbearing from enforcing the wholesale requirement. Therefore, it is unnecessary to reiterate our approval of the Commission's analysis. CPUC does, however, make one separate contention that the abandonment of the unbundling requirement would jeopardize 9-1-1 calls if there were an emergency when the power was out. There are times when only copper loops—being self-powered—could conduct 9-1-1 calls. The Commission's response in its brief is that it did not "engage in a detailed discussion about public safety because nothing in the Order will end TDM service." And California's position assumes that forbearance from the unbundling requirement would lead to the decline in the availability of copper networks. We agree that is by no means obvious. As we have observed, that is up to the decision of the incumbents, who can, if they wish, discontinue the use of copper networks. California is nevertheless correct that the FCC's Order did not explicitly respond to California's

---

[8] 47 C.F.R. § 51.333 (providing procedures for the retirement of copper facilities).

contention that the Order could have a negative impact on public safety.

This omission presents a troubling problem for the FCC, as we recognized the FCC's statutory mandate to consider public safety in a previous case. *See* 47 U.S.C. § 151; *Mozilla Corp. v. FCC*, 940 F.3d 1, 59 (D.C. Cir. 2019). The Commission may not subsequently assert that public safety issues were redundant of other issues that were addressed—that would be an off-limits post hoc rationalization. *Mozilla*, 940 F.3d at 62. Were it not for exceptional circumstances, the Commission's failure to address public safety considerations—which is an error—would require a remand.

However, California has essentially conceded the issue, which makes a remand pointless. At oral argument, CPUC ultimately admitted that the Order would not reduce the availability of line-powered TDM copper.[9] And, as the FCC pointed out in its brief, California is itself migrating its legacy 9-1-1 system to an IP-based communication system. The California Office of Emergency Services, the very state agency responsible for emergency preparedness, explained (apparently shortly before the Commission's Order issued) that incorporating next-generation networks would *increase* the safety and reliability of California's 9-1-1 system. CPUC did not dispute these statements. We would normally not take into account this non-record information, particularly when the information is subsequent to the promulgation of the rule. However, this is an unusual situation, where we actually have Petitioner's admission contrary to—or at least severely undermining—its position in its Brief. In other words, the

_____

[9] Paradoxically, the other Petitioner, Incompas, argued the Order would *prolong* the availability of TDM copper because, by returning incumbents to a "monopoly" position with regard to TDM copper and thereby making them more profitable, incumbents would maintain their legacy services longer than they would without forbearance.

FCC's error was not prejudicial. *See* 5 U.S.C. § 706 (instructing us to take "due account . . . of the rule of prejudicial error."); *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007). Given that CPUC effectively conceded that greater consideration of public safety would not change the outcome, we think a remand on this issue unnecessary.

\*\*\*

Petitioners assert that various findings and modes of analysis in the Order are inconsistent with past Orders, that those inconsistencies are unexplained, and thus that the Order is arbitrary and capricious.[10] *See Verizon Tel. Co. v. FCC*, 570 F.3d 294, 304 (D.C. Cir. 2009); *Mo. Public Service Comm'n v. FERC*, 337 F.3d 1066, 1073–74 (D.C. Cir. 2003). Several of those alleged inconsistencies involve the Commission drawing different—even directly contrary—conclusions about whether various statutory provisions are necessary or sufficient to protect consumers. For example, in the 2005 *Qwest Omaha Order*, the Commission did not find § 251(b)(1) resale to be adequate to protect consumers and so denied forbearance from the wholesale requirement in the Omaha metropolitan area. 20 FCC Rcd. 19415, 19460 (2005). It would hardly be surprising, however, that the Commission took different positions over the

---

[10] Petitioners raised a series of contentions that the Government's brief presents new post hoc arguments not referred to in the Commission's Order. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). We have recognized the *Chenery* doctrine applies in rulemaking. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 62 (D.C. Cir. 2019). But, as we noted, agencies engaged in rulemaking are obliged to respond only to significant comments in their concise general statement of a rule's basis and purpose. Therefore, an agency brief can be somewhat broader than its statement accompanying the rule. In any event, we have examined Petitioner's post hoc arguments and do not think they are of significance, other than the ones addressed above.

last few decades because the market for voice services and the relevant technology have changed dramatically. Indeed, agencies are expected to reevaluate the wisdom of their policies in response to changing factual circumstances. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005). Here, the FCC explained how the market had evolved and concluded—we think reasonably—that intermodal competition is now sufficient to discipline prices. The Commission need not do more to meet its burden under the Administrative Procedure Act.

Much is made of the FCC's "analytical framework." Specifically, it was argued that in the 2010 *Qwest Phoenix Order*, the Commission had used a different kind of market power analysis focused on individual geographic markets rather than the national market. 25 FCC Rcd. 8622, 8642–43 (2010). We have previously held that the forbearance statutory provision imposes "no particular mode of market analysis or level of geographic rigor" in making a forbearance determination and that the FCC is free to "tailor the forbearance inquiry to the situation at hand." *Earthlink,* 462 F.3d at 9; *see also USTelecom Ass'n v. FCC*, 825 F.3d 674, 728 (D.C. Cir. 2016). That's just what the Commission did here. The Commission's key conclusion that intermodal competition will discipline prices and protect consumers is synonymous with the conclusion that there is no market power nationally. Notably, the *Qwest Phoenix Order* involved a request for forbearance in a limited geographic area from an otherwise valid regulation, but this Order involves a challenge to the necessity of the regulation in the national market. As such, a different scope and method of analysis is not only reasonable, but to be expected. In fact, the Commission has already rejected the argument that *Qwest Phoenix* constrains its method of analysis related to requests for forbearance from regulations in the national market. *2015 USTelecom Forbearance Order*, 31 FCC Rcd at 6164.

Similarly, Incompas claimed the Commission applied a new and unexplained "framework" with respect to forbearance from avoided-cost resale. Incompas argued that the text, legislative history, and Commission precedent shows that the avoided-cost resale provision was not intended to facilitate facilities-based competition, but was intended to be a separate pro-competitive measure to ensure just and reasonable rates. But this is all beside the point. The key provision is the Commission's forbearance authority. And our precedent and Commission precedent is clear: the Commission may forbear to encourage the deployment of next-generation facilities. *See Earthlink*, 462 F.3d at 6; *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 579–80 (D.C. Cir. 2004); 47 U.S.C. § 1302(a) ("The Commission . . . shall encourage the deployment . . . of advanced telecommunications capability to all Americans).[11]

\*\*\*

Accordingly, we deny the petitions for review.

*So ordered.*

---

[11] In addition to the foregoing arguments, the Petitioners have made a number of other arguments which we have considered and reject without written opinion.